**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Zekeriya O., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 CV 7174 |
| v. | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| ANDREW SAUL, Commissioner | ) | |
| of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Zekeriya O. ("Claimant") brings a motion for summary judgment to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIBs"). The Commissioner brings a cross-motion asking the Court to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons that follow, Claimant's motion for summary judgment (Dkt. 17) is denied and the Commissioner's motion for summary judgment (Dkt. 24) is granted.

## I.     BACKGROUND

### A.     Procedural History

On September 18, 2015, Claimant filed for DIBs alleging disability beginning March 15, 2010 (when he was 50 years old) due to multiple sclerosis ("MS"), depression, vision

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by his first name and the first initial of his last name. Furthermore, Andrew Saul is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed. R. Civ. P. 25(d).

disturbances, fatigue, muscle stiffness, bladder problems, weakness, poor coordination, mood changes, memory problems, and leg pain. (R. 89, 247.) His date last insured was December 31, 2013. (R. 89.) Claimant's application was denied initially and upon reconsideration due to insufficient evidence prior to the date last insured. (R. 89-104.) Claimant filed a timely request for a hearing, which was held on August 23, 2017 before an Administrative Law Judge ("ALJ"). (R. 31-88.) Claimant appeared by video with counsel and offered testimony at the hearing. A vocational expert and a medical expert also offered testimony.

On November 29, 2017, the ALJ issued a written decision denying Claimant's application for benefits. (R. 15-25.) Claimant filed a timely request for review with the Appeals Council. (R. 206-07.) On September 7, 2018, the Appeals Council denied Claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-4.) This action followed.

**B.      Medical Evidence in the Administrative Record**

The administrative record contains the following medical evidence that bears on Claimant's claim:

**1.      Evidence from Claimant's Treating Physicians Prior to the Date Last Insured.**

Claimant received treatment at the Leone Chiropractic Clinic on two occasions prior to the date last insured. (R. 457.) On September 2007, Claimant presented with neck pain and radicular pain into the left arm and fingers. (*Id*.) According to chiropractor Dr. Antonio Leone, x-rays from that time period showed cervical disc degeneration at C5-C6. (*Id*.) The Clinic treated Claimant successfully over five visits and "released [him] from care with maximum improvement." (*Id*.) Claimant returned in July 2009 with the same symptoms and successful outcome following a two-week course of chiropractic treatment. (*Id*.) In his April 16, 2016

2

letter, Dr. Leone expressed no opinion regarding Claimant's application for disability because it had been too long since he treated him. (*Id.*)

On July 6, 2009, Claimant presented to internist Dr. Dang Ho at Christie Clinic complaining of a burning sensation from the waist down at both thighs, dizziness, and urine frequency. (R. 370.) Claimant explained that he previously had an "extensive workup done in Turkey" for numbness and tingling in the upper extremities that had since resolved. (*Id.*) Dr. Ho noted that the cervical spine x-ray from Turkey showed some straightening of the cervical spine, loss of the lordotic curvature, and some moderate degenerative changes of the disc. (*Id.*) Dr. Ho assumed Claimant also underwent a CT scan, but Claimant had not brought records from that scan. (*Id.*) A physical exam revealed normal results, though Dr. Ho described Claimant as slightly obese with borderline cholesterol levels. (R. 370-71.) Dr. Ho "could not find any diagnosis that may explain [Claimant's] peripheral neuropathy." (R. 370.) He recommended Claimant follow-up with the neurology department and bring his records from his work-up in Turkey. (*Id.*)

Claimant followed up with neurologist Dr. Charles Shyu a few weeks later on July 17, 2009, explaining that his burning pain started a month and a half prior and may have been caused by heavy lifting. (R. 368.) He analogized his discomfort to "being out in the sun too long." (*Id.*) He complained of some chronic back pain but denied weakness in his legs or upper extremities. (*Id.*) He described a previous incident a "couple decades ago" when he lifted something heavy, which caused back pain and numbness in the lower extremities for six months. (*Id.*) He did not recall the diagnosis, though he "did have some testing for this issue when he was in Europe." (*Id.*) Claimant described daily alcohol use and, at the time, worked as a "tavern owner." (*Id.*)

3

Upon physical exam, Dr. Shyu noted tenderness in the lower cervical region, and dysesthesia in the right thoracic and upper lumbar spine. (R. 368-69.) Dr. Shyu suspected a lesion of the spine "as opposed to neuropathy." (R. 369.) He recommended an MRI of the spine "with and without contrast to evaluate for syrinx and/or evidence of MS."[2] (*Id.*) Dr. Shyu planned to see Claimant following his MRI to discuss results and plan. (*Id.*) There is no evidence in the record Claimant underwent the MRI following Dr. Shyu's recommendation.

In December 2009, Claimant saw surgeon Dr. Feinberg for a possible hernia due to his now five-month history of pain "burning down his legs from his back." (R. 366.) Claimant denied dizziness, weakness, depression, or anxiety. (*Id.*) A physical exam revealed bilateral hernia and Dr. Feinberg recommended repair with a "plug and patch." (R. 367.) Dr. Feinberg performed the hernia repair surgery on January 14, 2010. (R. 359-60.) A pre-surgical EKG revealed normal sinus rhythm, with the possibility of an old inferior infarct. (R. 361.) A chest x-ray showed "minimal fibrotic type changes at the right base," but otherwise clear lungs. (R. 365.) At a post-surgical follow-up in February 2010, Claimant had some discomfort and concerns, but was otherwise feeling "pretty good." (R. 668.) Dr. Feinberg eased Claimant's concerns, advised him to call if he wanted an ultrasound, and increased his activity to "ad lib" (as desired). (*Id.*)

Claimant saw primary care physician Dr. Hoffman for a physical in October 2013. (R. 599-605.) Claimant complained of frequent urination, painful varicosity at the right calf especially after long drives, and irregular sleep habits because he was unemployed. (R. 602.) Past medical history included an enlarged prostate, venous insufficiency, and hernia repair

---

[2]  A syrinx is a fluid filled cavity within the spinal cord or brain stem. Symptoms include weakness of the hands and arms and deficits in pain and temperature sensation over the back and neck. *See* https://www.merckmanuals.com/professional/neurologic-disorders/spinal-cord-disorders/syrinx-of-the-spinal-cord-or-brain-stem (last visited May 18, 2020).

surgery. (R. 603.) Upon physical examination, Dr. Hoffman noted primarily normal findings, including a lack of tenderness of the spine and a normal gait. (R. 604.) Dr. Hoffman did note an enlarged prostate and varicose veins at the right medial ankle and calf, but no skin changes or obvious tenderness. (*Id.*) Dr. Hoffman ordered blood tests and prescribed Terazosin for urination problems. (R. 605.) Dr. Hoffman also "discussed compression stockings and available [interventional radiology] procedures" for varicose veins, but Claimant did "not feel things [were] severe enough yet for that." (*Id.*)

### 2. Evidence from Claimant's Treating Physicians Post-Dating the Date Last Insured.

Claimant presented to the Carle Physician Eye Department on October 10, 2014 complaining of blurry vision and a sluggish eyelid. (R. 469.) The examining physician assessed right sided facial weakness with lower eyelid droop, infrequent and incomplete blink reflex, and an asymmetrical smile, all of which raised concerns of a stroke. (R. 471.) Claimant was transported to the emergency room for stroke management. (*Id.*)

Upon admission, Claimant saw neurologist Dr. Llano and described suffering from blurry/double vision and a right-sided facial droop for two weeks. (R. 507-08.) Claimant's son, however, described facial droopiness dating back 6-9 months. (R. 508.) Claimant described a similar episode four years prior in Turkey. (*Id.*) At that time, "he was told that it was due to a problem in his neck." (*Id.*) He took muscle relaxers and his symptoms resolved. (*Id.*) Claimant also described an incident thirty years prior when his feet were numb and tingly for a year. (*Id.*) He denied his doctor's recommendation for a spinal tap at the time. (*Id.*) Claimant also described a history of seizures as a child. (*Id.*)

Upon exam, Dr. Llano noted right-sided full facial droop of mild to moderate severity, signs of hyperreflexia, and clonus in both ankles. (R. 508.) An MRI of the brain showed signs

of a prior stroke, multiple white matter abnormalities across both hemispheres and in the brain stem, and lesions.  (R. 509.)  According to Dr. Llano, these findings, along with Claimant's reported history of at least three neurological episodes, were consistent with MS.  (*Id*.)  Dr. Llano suspected Claimant "may have had a history of multiple sclerosis, which is only now coming to light."  (*Id*.)  Alternatively, Claimant could have a "demyelinating disorder or other white matter abnormality such as B12 deficiency."  (*Id*.)  Dr. Llano recommend a lumbar puncture, which Claimant refused.  (*Id*.)  Dr. Llano ordered further imaging, blood work, and prescribed a short course of steroids.  (*Id*.)

Claimant returned to see Dr. Llano in November 2014 and reported his symptoms had resolved and that he felt "good."  (R. 510.)  Upon exam, Dr. Llano noted Claimant's left pupil remained slightly sluggish and that the left side of his smile did not "activate as well."  (R. 511.)  Claimant again exhibited hyperreflexia.  (*Id*.)  Dr. Llano continued to suspect MS and recommended a further work up to confirm, including a lumbar puncture.  (*Id*.)

Claimant returned to see Dr. Hoffman for a physical in January 2015.  (R. 606-612.)  Claimant reported that he was diagnosed with MS in Fall 2014 following visual symptoms and an abnormal brain MRI.  (R. 609.)  Claimant explained he received steroid treatment and refused a spine MRI and lumbar puncture.  (*Id*.)  Claimant reported that he began taking Flomax, finasteride, and pravastatin after his October 2014 discharge from the hospital with some improvement in urinary symptoms.  (*Id*.)  A physical exam revealed normal results.  (R. 611.)

In March 2015, Claimant underwent the prescribed lumbar puncture and imaging, which, according to Dr. Llano, revealed results consistent with MS.  (R. 512-13.)  Dr. Llano noted that while clinically Claimant's "course has been relatively indolent," "his imaging would suggest that he has had multiple active lesions throughout his life."  (R. 513.)  Dr. Llano deferred the use

6

of interferon-based therapy in light of the "relative indolence of the disease" and Claimant's plan to travel to Turkey for the next six months. (*Id*.) Dr. Llano recommended Claimant connect with a neurologist in Turkey and further recommended treatment with high dose steroids during flare-ups. (*Id*.) Dr. Llano opined that Claimant "may be a good candidate for oral therapy such as Tecfidera in the future." (*Id*.) Dr. Llano further advised Claimant to follow-up with his colleague Dr. Khosrowshahi upon his return from Turkey. (*Id*.)

Claimant saw Dr. Khosrowshahi in September 2015. (R. 531.) Claimant reported he had not started taking Tecfidera because he "had been stable since last year" and had "no symptoms." (*Id*.) Dr. Khosrowshahi saw no abnormalities on physical exam. (R. 533.) She assessed the "relapsing-remitting" type of MS and noted Claimant "has no disability on exam and symptoms are only limited" to urinary issues. (*Id*.) Dr. Khosrowshahi agreed Claimant would be a good candidate for treatment with Tecfidera, explained the potential side effects, and recommended Claimant start taking the medication following her review of blood work results. (*Id*.)

The record is silent until September 23, 2016 when Claimant returned to see Dr. Khosrowshahi for "MS relapse." (R. 534.) Claimant explained that on a recent trip to Turkey, he developed double vision and ataxia and went to the emergency room. (R. 535.) Dr. Khosrowshahi reviewed the brain MRI from Turkey, which showed a new large lesion on the brain when compared to the October 2014 MRI. (R. 535.) Claimant continued to complain of double vision, dizziness, and tingling in his hands and feet. (*Id*.) Claimant was depressed about his diagnosis and wanted to discuss treatment options as he had never started taking Tecfidera as previously recommended. (R. 534-35.)

On exam, Claimant exhibited hyperactive reflexes in the arms and legs, impaired tandem walking, and a positive Romberg test. (R. 537.) Dr. Khosrowshahi assessed a long-standing

7

history of relapsing-remitting MS and evidence of a stroke at some point in his lifetime. (*Id*.) She noted Claimant's "disease [was] radiologically advanced." (*Id*.) Dr. Khosrowshahi recommended, and Claimant finally agreed, to start treatment with Tecfidera. (*Id*.) Dr. Khosrowshahi also referred Claimant for a psychiatric review for what she viewed as "situational and circumstantial depression" and for an eye exam. (*Id*.)

Claimant underwent a psychological consultation on October 24, 2016. (R. 472-80.) He explained that he has "struggled psychologically" since being diagnosed with MS and has been unable to work for 6-7 years. (R. 472, 474.) He described "no symptoms of anxiety or depression prior to 2014." (R. 480.) Claimant described a history of childhood seizures "a couple times a year." (R. 473.) Claimant said that he had MS dating back to his twenties, which was in remission for 27 years before he relapsed in 2010. (R. 478.) Claimant explained that he was diagnosed in Europe and referred to an American doctor, but he did not go initially because he was in denial. (*Id*.) He reported three "episodes" since 2010 during which he experienced double vision, balance, and memory problems. (*Id*.)

According to Claimant, he tried to stay active by walking around the yard, keeping up with the news, and spending time with his wife. (R. 477.) He reported difficulty sleeping at night and took naps during the day. (*Id*.) He relied on his wife for transportation because he did not trust himself to drive due to vision disturbances. (*Id*.) Claimant described intense hopelessness in regard to his MS diagnosis. (*Id*.) He described some suicidal ideations and the urge "just to give up." (R. 476.) He missed his independence and relied on his wife. (R. 473, 476.) The examining counselor described Claimant with a depressed affect, but good insight and judgment. (R. 476.) She assessed depression, anxiety, and recommended counseling and psychiatric evaluation to determine if medication management was appropriate. (R. 478-79.)

8

Claimant returned to the eye department in May 2017 complaining of decreased night vision and to check for any problems in his eye nerves related to MS. (R. 464.) He denied blurred and double vision. (R. 464.) Claimant's eye exam was normal and he was directed to follow-up as needed if he experienced reduced vision related to an MS flare-up. (R. 466.)

### 3. Evidence from Agency Consultants

Upon Claimant's initial application, State agency physician Dr. Michael Nenaber reviewed the record and found there was insufficient evidence prior to Claimant's date last insured to determine that he was disabled. (R. 92.) Psychologist Gayle Williamson reached a similar conclusion finding there was "insufficient evidence on which to evaluate the existence/severity of any disabling mental impairment" prior to the date last insured. (R. 93.) At the reconsideration level, the reviewing physicians agreed with the previous findings that "there is [i]nsufficient [e]vidence to establish an impairment, or combination of impairments of a disabling severity as it applies to DLI [date last insured]." (R. 101.) Claimant did not undergo a consultative physical or mental examination.

### C. Evidence from Claimant's Testimony

Claimant appeared with counsel at the hearing before the ALJ and testified as to his physical and mental impairments, daily activities, and related issues between 2010 and 2013. (R. 38.) At that time, Claimant was married and resided with his wife and one of his adult children. (R. 39.) He dropped out of high school in eleventh grade and never obtained his GED. (R. 44.) After leaving high school, Claimant began his career working in the restaurant business. (*Id*.) He last worked in March of 2010 as the owner/manager of a restaurant that has since closed. (R. 36-37.) He has not looked for work since then due to his physical and mental problems. (R. 38.)

Upon questioning by the ALJ, Claimant described his surgical history including the hernia surgery in 2010. (R. 42.) He confirmed he was diagnosed with MS in 2014. (*Id.*) During 2010 and 2013, Claimant was taking Tamsulosin and Finasteride, among other medications he could not recall and he also told the ALJ he took a two-month trip to Turkey at some point during that time period. (R. 43, 41.) Claimant explained that he required a wheelchair for the flight and was treated with a steroid while in Turkey. (R. 65.)

Upon further questioning by his attorney, Claimant described his symptoms between 2010 and 2013, which he later attributed to MS. (R. 46.) According to Claimant, he had "issues" with his neck and back and numbness and spasms in his legs. (*Id.*) He testified he suffered from dizziness, balance problems, memory issues, frequent urination, severe fatigue, and sleepless nights. (R. 47-50.) Claimant also testified to high cholesterol and two or three infections following his hernia surgery in 2010. (R. 52-53.) Claimant testified that he had problems with his right wrist and hands dating back to 2010, including difficulty gripping and holding items. (R. 53-56.) He reported at least four or five facial droop and double vision episodes between 2010 and 2013. (R. 62-63.) The episodes lasted anywhere from a week to a month, and he would often spend two to three days at a time in bed during each episode. (R. 63.) Claimant also testified about his mental health, explaining that he suffered from depression between 2010 and 2013 because of his symptoms and his inability to support his family. (R. 66-67.)

According to Claimant, he sought treatment from Dr. Ho for his physical symptoms in 2010 and reported to Dr. Ho that he had experienced a facial drooping episode. (R. 47, 62.) Claimant further testified that Dr. Ho suspected he had MS and recommended that he obtain an

MRI but Claimant was in denial and could not afford the recommended MRI without insurance. (R. 47-48, 62.)

Claimant reported that he could stand for less than an hour, sit for thirty to forty minutes at a time, walk for less than a block, and climb ten stairs while holding the rail during the 2010 – 2013 time frame. (R. 56-57.) On a typical day during that time frame, Claimant woke at 7:00 a.m. and began his morning routine, which took over an hour due to coordination problems. (R. 57-59.) His wife helped him bathe, get dressed, and put on his shoes. (R. 58-59.) His wife also did all of the cooking, cleaning, and shopping. (R. 60.) Claimant tried to stay busy by using the computer for social media, news, and MS research, or walking around the house. (R. 57, 61.) His medication made him drowsy so he napped two times a day. (R. 50-51.) He did not do much driving because he was "afraid to drive" due to his condition. (R. 40.) His license expired in 2010 and he just recently renewed it. (R. 39-40.)

### D.    Evidence from the Medical Expert's Testimony

Internist Dr. Ashok Jilhewar appeared and testified at the hearing as a medical expert ("ME"). The ALJ first asked the ME to identify Claimant's medically determinable impairments established by the record from March 15, 2010 (the onset date) through December 31, 2013 (the date last insured). (R. 68.) The ME identified a history of bilateral inguinal hernia repair without any indication of post-operative infections or wounds. (R. 69.) Next, the ME noted Dr. Ho's notation of peripheral neuropathy of unknown cause potentially related to alcohol use. (*Id.*) The ME reviewed the report from Dr. Shyu's July 17, 2009 neurological consultation and noted that the "[c]linical finding was [a] normal neurological examination." (R. 70.) The ME also noted Dr. Shyu's finding that Claimant had dysthesia, or touch sensation, and that the symptoms were probably related to a spinal lesion. (R. 69-70.) According to the ME, however, the record

did not include additional neurological symptoms or treatment from 2009 to 2013. (R. 70-71.) The ME also reviewed the records from Claimant's October 2013 physical, which revealed urinary problems due to an enlarged prostate, varicose veins, and moderate obesity. (R. 70.)

According to the ME, Claimant's history of hernia repair is a severe impairment when coupled with moderate obesity, but he did not satisfy any Listings. (R. 71-72.) The ME would limit Claimant to light physical activity based on his impairments. (R. 71.)

Upon questioning by Claimant's counsel, the ME agreed that MS is a chronic, incurable disease that can appear over time, but pointed out the lack of diagnosis during the relevant time period. (R. 72-73.) As for Claimant's testimony regarding episodes of blurry vision and lack of balance during 2010 and 2013, the ME could not necessarily attribute those symptoms to MS because Claimant "also had a scar of old infarct . . . so there could [have] be[en] transient ischemic attacks." (R. 73.) Ultimately, the ME had "no idea" what caused Claimant to experience these episodes. (R. 73.) The ME clarified that while Claimant's 2011 CAT scan did show some calcifications of the arteries, he had no clear risk of coronary artery disease. (R. 74.) The ME also explained that the two medications Claimant testified to taking during the relevant time are used to treat issues related to an enlarged prostate. (R. 74-75.) Lastly, the ME could not say if Claimant satisfied Listing 11.09 for MS based on his testimony of symptoms because there is no accompanying documentation of clinical findings. (R. 76.)

### E.    Evidence from the Vocational Expert's Testimony

A vocational expert ("VE") also offered testimony at the hearing. The VE first classified Claimant's past work as a restaurant manager as skilled and light under the Dictionary of Occupational Titles, but heavy as performed by Claimant. (R. 78.) Next, the ALJ asked the VE to consider a hypothetical individual of the Claimant's age, education, and experience who could

12

perform a full range of light work. (*Id*.) The ALJ explained that such an individual could not perform Claimant's past work as he performed it but would have transferable skills to work in the semi-skilled positions of waiter, bartender, and cook. (R. 78-79.)

Next, the ALJ asked the VE to consider an individual who could perform light work but could only occasionally climb ramps and stairs, never ladders, ropes or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could frequently reach and finger with both upper extremities; and could tolerate frequent exposure to heat, cold, and hazards such as moving machinery and unprotected heights. (R. 79.) The VE opined that the individual could still perform work as a waiter, bartender, and cook. (*Id*.) If the individual were further limited to simple, routine tasks requiring no more than simple instructions and decision making, those jobs would be precluded. (R. 80.) However, such an individual could work in the light unskilled representative positions of cleaner/housekeeper, production assembler, and bottling line attendant. (R. 80-81.) If the individual could only perform sedentary work with the same additional limitations, he could work in the representative sedentary, unskilled positions of shadow graph scale operator, stone setter, or ampoule sealer. (R. 81-83.) The VE then explained that employers typically require 90% on-task time and will tolerate no more than two absences per month. (R. 83.) An individual who required two hours of break time per day, or a 10-15 minute break per hour to use the restroom could not maintain employment. (R. 83-84.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).
Consequently, this Court will affirm the ALJ's decision if it is supported by substantial evidence.
*Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). Substantial evidence "means – and means
only – 'such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion.'" *Biestek v. Berryhill,* 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison
Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1983).

This Court must consider the entire administrative record, but it will not "re-weigh
evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for
that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court
will "conduct a critical review of the evidence" and will not let the Commissioner's decision
stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel.
Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Court will focus on whether the ALJ
has articulated "an accurate and logical bridge" from the evidence to his/her conclusion. *Dixon
v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently
articulate [his or her] assessment of the evidence to 'assure us that the ALJ considered the
important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v.
Shalala,* 999 F.2d 180, 181 (7th Cir. 1993), *quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th
Cir. 1985) (internal quotations omitted). This requirement is designed to allow a reviewing court
to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial
review." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds
could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's
opinion is adequately explained and supported by substantial evidence. *Elder v. Astrue,* 529 F.3d
408, 413 (7th Cir. 2008).

### B.     The Standard for Proof of Disability Under The Social Security Act

In order to qualify for DIBs, a claimant must prove that he or she was "disabled" under the Act prior to the expiration of their insured status. *Shideler v. Astrue,* 688 F.3d 306, 311 (7th Cir. 2012). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id*. at 886.

### C.     The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his alleged onset date of March 15, 2010 through his date last

insured of December 31, 2013.  (R. 17-18.)  Next, at step two, the ALJ determined that Claimant

suffered from the severe impairments of "status post-inguinal hernia and obesity."  (R. 18.)  The

ALJ found that Claimant's prostate symptoms were non-severe because they only appeared to

minimally affect his ability to work.  (*Id*.)  The ALJ also considered Claimant's MS at step two,

noting that "he did not express complaints about any symptoms within the relevant period nor

did any provider suggest that the claimant might have multiple sclerosis during this period."

(*Id*.)  As such, the ALJ concluded that there was no evidence of a medically determinable

impairment of MS prior to the date last insured.  (R. 19.)  Similarly, despite Claimant's

complaints of depression and anxiety, the ALJ found that there was no record of any medically

determinable mental impairment prior to the date last insured.  (R. 19-20.)  Next, at step three,

the ALJ concluded that Claimant did not have an impairment or combination of impairments that

met or medically equaled one of the Commissioner's listed impairments.  (R. 20; *see* 20 C.F.R.

Part 404, Subpart P, App. 1.).

      The ALJ went on to assess Claimant's RFC, ultimately concluding that he had the RFC to

perform light work as defined in 20 C.F.R. § 404.1567(b) except he could occasionally climb

ramps and stairs, never ladders, ropes, or scaffolds; could occasionally balance, stoop, crouch, or

crawl; could frequently reach in all directions and handle with both upper extremities; and could

tolerate frequent exposure to extreme cold or heat and hazards such as moving machinery or

unprotected heights.  (R. 20.)  The ALJ further limited Claimant to "simple, routine tasks

requiring no more than short simple instructions and simple work-related decision making with

few workplace changes."  (*Id*.)  Based on this RFC, at step four, the ALJ determined that

Claimant could not perform his past work as a restaurant manager.  (R. 23-24.)  However, at step

five, the ALJ concluded that given Claimant's age, education, and RFC, he could perform certain

light unskilled jobs that exist in significant numbers in the national economy, including the representative occupations of housekeeper, assembler production, or bottling line attendant. (R. 25.) As such, the ALJ found that Claimant was not under a disability from his alleged onset date through the date last insured. (*Id.*)

### D. The Parties' Arguments in Support of their Respective Motions for Summary Judgment

In his motion, Claimant argues that the ALJ's decision is not supported by substantial evidence because his medical records prove that he suffered from MS prior to his date last insured (December 31, 2013) ("DLI"). Although Claimant admits his treating "doctors all made the diagnosis of MS subsequent to the DLI," he asserts that the ALJ failed to give proper weight to these doctors' opinions. (Dkt. 17 at 3-5; Dkt. 26 at 3.) Claimant further asserts that the ALJ improperly relied on the ME and that his own testimony at the hearing supports the conclusion that he had MS prior to the DLI. (Dkt. 17 at 3-5.) The Court disagrees and finds that the ALJ's opinion is supported by substantial evidence for the reasons below.

### 1. The Physicians Who Treated Claimant Prior To His Date Last Insured Did Not Diagnose Him With MS.

It is well-settled that Claimant "bears the burden of producing medical evidence that supports h[is] claims of disability." *Eischstadt v. Astrue,* 534 F.3d 663, 668 (7th Cir. 2008); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). The "critical inquiry" in this regard is whether Claimant was able to show that he became disabled with his asserted disabling condition (here, MS) between his alleged onset date (March 13, 2010) and his DLI (December 31, 2013). *Thompson v. Colvin,* No. 12 C 585, 2013 WL 1718768, at *1 (N.D.Ill. Apr. 18, 2013) (citing to *Pepper v. Colvin,* 712 F.3d 351, 354 (7th Cir. 2013)). The ALJ was required to consider all relevant evidence in the record – regardless of whether such evidence pre-dates the onset date or

post-dates the DLI – when determining whether Claimant has met his burden.  *See, e.g., Alesia v. Colvin,* No. 12 C 8395, 2015 WL 5062812, at *6 (N.D.Ill. Aug. 26, 2015) ("A medical report from before onset (or after the insured period) often can illuminate the claimant's condition during the insured period, and the ALJ must consider and provide reasons for rejecting such a report in denying a claim") (citing cases and to 20 C.F.R. §§404.1520(a)(3), 416.920(a)(3)).

In this case, the ALJ considered all of the relevant evidence and she did not – contrary to Claimant's contention – "dismiss[] out of hand the possibility that [he] was suffering from MS prior to his DLI."  (Dkt. 17 at 5.)  The ALJ first examined the medical evidence that pre-dated the onset date.  (R. 18.)  She found that Claimant complained to Dr. Ho regarding "lower extremity burning" – and not upper extremity numbness – and that Dr. Ho had no diagnosis that might explain the burning but that it was possible that alcohol was causing the symptoms.  (R. 18.)  The ALJ further found that Claimant followed up with a neurologist (Dr. Shyu) and another physician (Dr. Feinberg) regarding the lower extremity burning, which was related to a hernia that was subsequently addressed.  (R. 18-19.)  The ALJ also noted that although the neurologist ordered several MRIs, there were no follow-up notes or MRIs in the record.  (R. 19.)  Claimant does not address the ALJ's findings regarding these physicians in his motion.

With respect to the period of time between the date of onset and DLI (the "Relevant Period"), the ALJ found that Claimant "did not express complaints about any symptoms . . . nor did any provider suggest that the claimant might have multiple sclerosis."  (R. 18.)  In particular, the ALJ noted that the *only* medical record during the Relevant Period was from a physical which was conducted by Dr. Hoffman (Claimant's primary care physician) on October 8, 2013. (R. 19.)  As the ALJ found:

> At that time, the claimant's primary complaints were related to his prostate, as well as weight gain related to smoking cessation.  He did complain of some water

retention/edema, but during the physical exam, no edema was noted. He did have some varicosities noted in his right medial ankle and calf, but no skin changes or obvious tenderness. . . . His gait and station were normal. They also reviewed whether he had sleep apnea symptoms. During this visit, *there were no complaints of dizziness, numbness, blurred vision, heat intolerance, muscle stiffness, clumsiness, tremors, burning, or any other symptoms that would be consistent with MS.*

(R. 19 (citation omitted) (emphasis added).) Claimant does not dispute the ALJ's findings regarding Dr. Hoffman and his records.

### 2. The ALJ Did Not Err By Finding That The Evidence From The Physicians Who Treated Claimant After His Date Last Insured Failed To Establish That Claimant Was Disabled Within The Relevant Period.

Claimant, who admits that no physician diagnosed him with MS until *after* his DLI (Dkt. 26 at 3), asserts that the ALJ erred by not giving proper weight to the opinions of the physicians who treated him months or years after his DLI in 2014, 2015, and 2016. According to Claimant, each of these physicians found that he had MS at the time they treated him *and* retrospectively diagnosed him as having MS during the Relevant Period. (Dkt. 17 at 3-5.) Claimant also asserts that his testimony during the hearing regarding the symptoms he was experiencing during the Relevant Period provides further support for his treating physicians' opinions. (Dkt. 17 at 3.)

Claimant is correct that evidence from a physician who provides treatment after the date last insured can under some circumstances establish that a person was disabled within their insured period. In particular, the Seventh Circuit has held that "'[r]etrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of past impairment.'" *Allord v. Barnhart,* 455 F.3d 818, 822 (7th Cir. 2006), *quoting Newell v. Commissioner of Social Security,* 347 F.3d 541, 547 (3d Cir. 2003); *Cohen v. Astrue,* 258 Fed.Appx. 20, 27-28 (7th Cir. 2007). The need for corroborating evidence from the Relevant Period is particularly important here because "there is nothing in the record to suggest that MS is

the type of condition that follows a well-known progression so that a date of disability can be inferred after the fact without contemporary corroboration." *Cohen,* 258 Fed.Appx. at 28; *Current v. Astrue,* No. CIV. A. 08-4963, 2009 WL 3319887, at *6 (E.D.La. Oct. 13, 2009) (same).

Claimant's argument that the ALJ erred by not giving controlling weight to his post-DLI treating physicians evidence fails for two reasons. First, contrary to Claimant's assertion, these physicians did not actually retrospectively diagnose him as having MS during the Relevant Period. Claimant repeatedly mischaracterizes the physicians' findings in his brief. For example:

a.  With respect to Dr. Llano, who treated him in October 2014, Claimant's brief states that "[a]s early as October 2014, the doctor records indicate that he had multiple active lesions his entire life. This predates the DLI. The most likely diagnosis *was* multiple sclerosis." (Dkt. 17 at 3 (citing R. 513) (emphasis added.) The cited page from the records actually states that "I believe the most likely diagnosis for [Claimant] is that he *has* multiple sclerosis. Clinically, his course has been relatively indolent. However, his imaging would suggest that he has had multiple active lesions throughout his life." (R. 513) (emphasis added);

b.  Again with respect to Dr. Llano, Claimant's brief states that "[o]n November 12, 2014, he was diagnosed with MS *and has had this disease for years.*" (Dkt. 17 at 4) (citing R. 519) (emphasis added.) The cited page of the record actually states that "I suspect this patient likely has a diagnosis of multiple sclerosis" and it mentions nothing about how long Dr. Llano believes that Claimant has had MS, let alone that he has had it "for years." (R. 519.); and

c.  With respect to Dr. Khosrowshahi's September 2015 neurological report, Claimant's brief states "[a] past medical history five years prior to this report revealed a diagnosis of MS." (Dkt. 17 at 4) (citing R. 541, 542.) The cited pages of the report do not contain any such statement. The report actually states that Claimant "was seen in the ED and then admitted to Carle Observation unit in October 2014 for an acute onset of vertical diplopia since 2 weeks prior to that visit. He was seen by Dr. Llano and underwent work-up. With the clinical history that he provided and MRI of brain findings, multiple sclerosis was a highly likely diagnosis." (R. 541.) The report also stated that "a few years ago he had an episode of ataxia with diplopia and it resolved in a few weeks and in Turkey he had a work-up but no definitive diagnosis was made." (R. 541.) (This appears to be a reference to an episode that Claimant reported to Dr. Ho during his July 6, 2009 examination. (R. 370.))

20

Claimant's brief also references a record from his September 2016 visit with Dr. Khosrowshahi which states that Claimant "has a long-standing history of relapsing-remitting multiple sclerosis" and that "[h]is symptoms of MS have been ongoing since the early 1980s." (R. 547.) However, neither this record nor the others referenced above show that any of Claimant's treating physicians retrospectively diagnosed him with MS during the Relevant Period. Nor do the above records show that Claimant met the conditions for a finding of disability under Listing 11.09 for MS during the Relevant Period. Merely having one or more symptoms of a disease does not prove that a claimant is disabled because "the issue is not whether [claimant] had impairments at his DLI, but whether the record shows that those impairments were disabling at that time." *Stojakovic v. Berryhill,* No. 16 C 10525, 2017 WL 4237034, at *2 (N.D.Ill. Sept. 25, 2017).

Second, the ALJ found that there was no contemporaneous corroborating evidence to support a retrospective diagnosis of MS even if one had been made. In particular, the ALJ acknowledged that Claimant "had alleged a history of symptoms of multiple sclerosis for 30 years" and that he testified to having experienced three "episodes" since 2010. (R. 19.) However, the ALJ choose not to credit Claimant's testimony regarding this history and the episodes because "there is no evidence of any complaints of a medically determinable impairment of multiple sclerosis prior to the date last insured" and "none of the[] 'episodes' have been included in the records for review." (R. 19.)[3]

The ALJ was entitled to disregard Claimant's testimony during the hearing based upon the inconsistencies between his testimony and his contemporaneous report to his physician

---

[3] The inconsistency between Claimant's testimony and the contemporaneous medical record is illustrated in part by his testimony regarding Dr. Ho. Claimant testified that he reported a facial drooping episode when he saw Dr. Ho in 2010. (R. 47, 62.) However, Dr. Ho's records contain no reference to a facial drooping episode and they indicate that Dr. Ho saw Claimant on July 6, 2009. (R. 370-71.)

within the Relevant Period. *See, e.g., Murphy v. Berryhill*, 727 Fed.Appx. 202, 207 (7th Cir. 2018) (affirming the ALJ's opinion as "properly based on the incongruity between the relatively modest symptoms [Claimant] reported to her doctors and the more severe symptoms [Claimant] ... reported to the ALJ."); *Cohen,* 258 Fed.Appx. at 26 (fact that claimant's "hearing testimony contradicted her contemporaneous reports to physicians and their independent observations . . . is a legitimate basis for affording little weight to her testimony"); *Elder,* 529 F.3d at 414 (finding it was within the ALJ's authority to disregard Claimant's testimony because it conflicted with what she told her treating physician); *see also Pape v. Colvin,* No. 13-CV-236-JDP, 2014 WL 4186827, at *6 (W.D.Wis. Aug. 21, 2014) (warning that "a claimant's own testimony is self-serving and, by itself, not usually sufficient corroboration of a retrospective diagnosis").

### 3. The ALJ Did Not Err When She Gave Great Weight To The Opinion Of The ME.

Next, Claimant argues that the ALJ erred by giving great weight to the opinion of the ME (Dr. Jilhewar) instead of relying on the post-DLI opinions of his treating physicians. (Dkt. 17 at 4-5.) Although "a treating physician's opinion is usually entitled to controlling weight, it must be 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not contradicted by other substantial evidence." *Lloyd v. Berryhill,* 682 Fed.Appx. 491, 496 (7th Cir. 2017), *quoting* 20 C.F.R. §404.1527(c); *Stage v. Colvin,* 812 F.3d 1121, 1126 (7th Cir. 2016). On the record before the Court, Claimant's treating physician argument simply misses the mark.

To begin, Claimant's post-DLI treating physicians' opinions regarding Claimant's condition *prior* to the DLI were not based on medically acceptable clinical and laboratory diagnostic techniques. Instead, their statements regarding Claimant's history of MS symptoms were based on Claimant's recitation of his past symptoms and course of treatment. (R. 19.) It is

22

well-settled that an ALJ may discount a treating physician's opinion if it is based "on claimant's subjective complaints rather than objective medical evidence." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016); *Lloyd,* 682 Fed.Appx. at 495-96; *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008); *White v. Barnhart,* 415 F.3d 654, 659 (7th Cir. 2005).  Furthermore, to the extent that Claimant's post-DLI physicians' reports could be interpreted to suggest that Claimant had MS symptoms during the Relevant Period, their reports are inconsistent with the records of Dr. Hoffman – who treated Claimant during the Relevant Period and whose records reflect that Claimant had *no* "symptom[s] that would be consistent with MS."  (R. 19.)  The ALJ did not err by weighing the evidence to reach a conclusion based on Dr. Hoffman's records rather than Claimant's post-DLI physicians' records on this issue.

Furthermore, the ALJ did not err by according great weight to the opinion of the ME. Dr. Jilhewar reviewed the record in detail and testified at the hearing about the lack of medical records showing Claimant suffered from MS-related symptoms during the relevant time frame. (R. 22-23.)  He did, however, limit Claimant to light work based on his history of hernia repair and obesity.  The ALJ afforded this opinion "great weight" because it was consistent with the record as a whole.  (R. 22-23.)  Claimant has offered no specific reasons as to why the ME's opinion is inconsistent with the record and the Court sees none.  As such, the ALJ's decision to rely on the opinion of the ME is supported by substantial evidence.  *See, e.g., Lloyd,* 682 Fed.Appx. at 497 (affirming ALJ's decision to give Dr. Jilhewar's opinion "considerable weight" and credit his opinion over the opinion of a treating physician); *Michelle G. v. Berryhill,* No. 18 C 408, 2019 WL 268618, at *9 (N.D.Ill. June 3, 2019) (same); *Mike H. on behalf of Mary H. v. Saul*, No. 18 CV 50162, 2019 WL 3554298, at *4 (N.D. Ill. July 31, 2019) (affirming ALJ's

reliance on the ME's opinion where the ME reviewed all of the evidence and claimant failed to point to any medical opinion or other evidence in the record to contradict the ME's opinion).

In sum: the ALJ properly reviewed the entire record, including evidence after the date last insured, and appropriately relied upon the opinion of the ME. Given the absence of evidence supporting Claimant's claim that he was disabled prior to his date last insured, the ALJ's decision is supported by substantial evidence. *See, e.g., Million v. Astrue*, 260 Fed.Appx. 918, 922 (7th Cir. 2008).

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's opinion is supported by substantial evidence and should be affirmed. Accordingly, Claimant's motion for summary judgment (Dkt. 17) is denied and the Commissioner's motion for summary judgment (Dkt. 24) is granted. It is so ordered.

**ENTERED:**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

**Dated: May 20, 2020**